UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
JULIA MARTINEZ-PAULINO,

                    Plaintiff,

                                                11 Civ. 5485 (RPP)

           - v. -

                                             **OPINION & ORDER**

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                    Defendant.
------------------------------------------------------------X


**ROBERT P. PATTERSON, JR., U.S.D.J.**

      On August 8, 2011, Plaintiff Julia J. Martinez-Paulino ("Plaintiff") filed this action

pursuant to § 205(g) and § 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g),

1383(c)(3), challenging the final decision of the Commissioner of Social Security (the

"Commissioner") denying her Supplemental Security Income ("SSI") benefits under the Social

Security Act (the "Act"). (Compl. ¶ 1-8.)  On December 16, 2011, the Commissioner filed an

answer to Plaintiff's complaint. (Answer ¶ 1-9.)  On February 8, 2012, Plaintiff filed a motion

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") for a judgment

on the pleadings and for denial of the Commissioner's cross-motion. (Pl.'s Mem. in Opp. to the

Def.'s Cross-Mot. for J. on the Pleadings and in Supp. of Her Mot. for J. on the Pleadings ("Pl.'s

Br.") at 1.)  On April 11, 2012, the Commissioner opposed Plaintiff's motion and cross-moved

for a judgment on the pleadings affirming the Commissioner's decision that the Plaintiff was not

disabled. (Mem. in Supp. of the Commissioner's Cross-Mot. for J. on the Pleadings and in Opp.

to Pl.'s Mot. for J. on the Pleadings ("Def.'s Br.") at 1.)  On May 14, 2012, Plaintiff filed a reply

to the Commissioner's motion.  For the foregoing reasons, the Commissioner's motion is granted.

## I.  BACKGROUND

### A.  Procedural History

On July 15, 2008, Plaintiff filed an application for SSI benefits under Title II and Title XVI of the Act. (Tr. of the Administrative R. ("Tr.") at 70-73.)  Therein, Plaintiff sought benefits retroactive to July 1, 2008, the date of the alleged onset of her disability, (Tr. at 10, 70), due to depression, headaches, forgetfulness, back pain, and stomach pain, (Tr. at 83.)  Plaintiff's application was denied by the Commissioner on October 22, 2008. (Tr. at 37-48.)

On November 19, 2008, Plaintiff filed a written request for a hearing. (Tr. at 10.)  On December 15, 2009, Plaintiff, represented by paralegal Anastasia Eccles, appeared before Administrative Law Judge Wallace Tannenbaum (the "ALJ") for a hearing. (Tr. at 10, 21-35.) On January 21, 2010, the ALJ issued a letter decision finding Plaintiff "not disabled" under the Act, and denying Plaintiff's claim for SSI benefits. (Tr. at 7-16.)  Plaintiff requested review by the Appeals Council, and on June 14, 2011, the Appeals Council denied Plaintiff's request, making the ALJ's decision the final decision of the Commissioner. (Tr. at 1-4, 113-16.)  On August 8, 2011, Plaintiff filed the instant action in this court.

### B.  Non-Medical Evidence

Plaintiff was born on July 21, 1972, in the Dominican Republic, and completed schooling through the eighth grade before immigrating to the United States in 1989. (Tr. at 23-24.)  Her primary language is Spanish, though she is able to understand some English. (Tr. at 24, 82.)  She was 36 years old on July 1, 2008, the date of the alleged onset of her disability. (Tr. at 25.)

At the December 15, 2009 hearing before the ALJ, Plaintiff indicated that she was last employed in a grocery store from 2006 to 2008. (Tr. at 25.)  Plaintiff stated that she worked seven to eight hours a day, five days per week. (Tr. at 26.)  Her responsibilities included cleaning, taking care of customers, and occasionally working as a cashier. (Id.)  Plaintiff was unable to recall the exact date that she stopped working, but testified it was in the beginning of 2008.[1] (Id.)  Plaintiff stated that she stopped working because she was unable to fulfill her duties because of her depression, but upon clarification, Plaintiff reported that she was fired from the job due to her bad temper. (Id.)  Plaintiff stated that she had not sought further employment since that time because she was very nervous and suffered from stomach problems. (Tr. at 26-27.)  When asked the same question later in the hearing, however, Plaintiff responded that she had not sought further employment because she suffered from depression. (Tr. at 31.)

Plaintiff reported that she lived in an apartment with her four children, aged four, twelve, thirteen, and seventeen. (Tr. at 22-23.)  Plaintiff testified that she did the cooking for herself and her children, the cleaning and laundry with help from her daughter and cousin, and went shopping with her children. (Tr. at 29.)  Plaintiff stated that she was able to use public transportation, such as the bus, by herself, but did not take trains because she was afraid to go by herself and did not know how to navigate them. (Tr. at 30-31.)  Plaintiff indicated that she visited her cousin's house once per week, and occasionally went to her children's schools, but generally did not like going outside. (Tr. at 23, 33.)  Plaintiff also reported recently traveling to the Dominican Republic for five days. (Tr. at 30-31.)

---

[1] Plaintiff gave conflicting accounts regarding the date she stopped working at the grocery store.  In an undated disability report submitted by Plaintiff, she reported that she stopped working on April 10, 2008. (Tr. at 83.)  However, in the Federation Employment and Guidance Service ("F.E.G.S.") report, dated April 22, 2008 to May 7, 2008, Plaintiff reported that she stopped working in April 2007. (Tr. at 129.)

Plaintiff stated that she attended a monthly clinic for her stomach problems, and saw a therapist biweekly and a psychiatrist once a month for depression and anxiety. (Tr. at 27-28.) Plaintiff reported difficulties sleeping, trouble getting out of bed in the morning, and memory lapses, such as forgetting why she went into a room and not remembering her dreams. (Tr. at 32-33.)  Plaintiff stated that the medications prescribed to her for her various ailments were only slightly helpful. (Tr. at 32.)

**C.    Medical Evidence**

The administrative record contains six separate medical reports.  These are: (1) a biopsychosocial evaluation at the Federation Employment and Guidance Service ("F.E.G.S."), dated April 22, 2008 to May 7, 2008, (Tr. at 126-43), (2) an examination by Plaintiff's primary care physician, Dr. Virgilo Valdez, M.D., dated August 26, 2008, (Tr. at 117-22), (3) an internal medicine exam by Dr. Jerome Caiati of Industrial Medicine Associates, P.C., dated October 2, 2008, (Tr. at 144-47), (4) a consultative psychiatric evaluation by Dr. Haruyo Fujiwaki, Ph.D. of Industrial Medicine Associates, dated October 2, 2008, (Tr. at 149-52), (5) a psychiatric and residual functional capacity assessment by state agency review psychologist Dr. T. Harding, dated October 20, 2008, (Tr. at 153-72), and (6) an unsigned and undated report for claim of disability due to mental impairment, covering the period of August 24, 1998 to November 3, 2009, (Tr. at 181-87).

*1.    Federation Employment and Guidance Service ("F.E.G.S.") Report*

Between April 22, 2008 and May 7, 2008, Plaintiff underwent a "biopsychosocial" evaluation at F.E.G.S. (Tr. at 126.)  Plaintiff arrived to the April 22, 2008 appointment by taxi, and told the examiner she was unable to travel alone because she gets lost. (Tr. at 132.)  Plaintiff reported that she was capable of washing dishes, doing laundry, sweeping and mopping the floor,

4

making beds, cooking meals, and taking care of her personal needs. (Tr. at 133.)  Plaintiff stated

that she was unable to vacuum, shop for groceries, or socialize. (Id.)  Plaintiff indicated that she

liked to use the computer. (Id.)  Plaintiff reported she had stomach pain, back pain, and an ulcer.

(Tr. at 133, 136.)  Plaintiff denied current suicidal ideations or hallucinations, but admitted to

attempting suicide three times in 1998 by ingesting poison, suffering an alcohol problem until

1998, and previously hearing voices and hallucinating. (Tr. at 131.)  Plaintiff reported receiving

mental health services at Upper Manhattan Mental Health Clinic since 1998 for major depressive

disorder. (Tr. at 132.)  Plaintiff stated that she frequently felt hopeless, had difficulty sleeping,

felt lethargic, had poor self-esteem, and was restless. (Tr. at 131-32.)  Plaintiff indicated no loss

of appetite or overeating. (Tr. at 132.)  Plaintiff's Patient Health Questionnaire-9 ("PHQ-9")

Score, which relied on self-reported answers, yielded a score of sixteen, indicating a depression

rating of moderate to severe. (Id.)

        Dr. Arnold Blank performed a medical examination on Plaintiff. (Tr. at 136-39, 140-43.)

He found Plaintiff's abdomen to be soft and non-tender, and her overall physical examination to

be normal. (Tr. at 136, 143.)  A mental status examination revealed orientation in three spheres.

(Id.)  Dr. Blank found that Plaintiff was cooperative, but that she was not alert, that her recent

and remote memories were not intact, that she was easily distracted, that her speech and fund of

knowledge were abnormal, and that she appeared depressed. (Tr. at 136, 139, 143.)  Dr. Blank

did not assess Plaintiff's work limitations because her psychiatrist, Dr. Yvonne Kury, submitted

a letter requesting that Plaintiff be given a four-month exemption from work for treatment of her

depression. (Tr. at 137-38.)

        2.      *Dr. Virgilio Valdez, Primary Care Physician*

On July 14, 2008, Plaintiff was examined by her primary care physician, Dr. Virgilo Valdez, M.D.  On August 26, 2008, Dr. Valdez issued a medical report regarding his treatment of Plaintiff. (Tr. at 117-22.)  He reported that he had treated Plaintiff for gastroesophogeal reflux disease ("GERD"), gastritis-duodenitis, and anxiety-depression since January 2003. (Tr. at 117.) Dr. Valdez stated that Plaintiff's symptoms at the time of the exam included epigastric pain, bloating, and nausea, and that Plaintiff had a history of depression, heartburn, bloating, and regurgitation. (Tr. at 117-18.)  There was no history of trauma, joint inflammation, muscle spasm, or sensory or motor deficits. (Tr. at 118-19.)  Dr. Valdez prescribed Plaintiff Prilosec, and noted that Plaintiff was also taking medications prescribed by her gastroenterologist (though she was unaware of the exact medications), as well as Lexapro and Ambien, both of which were prescribed by her psychiatrist. (Tr. at 118.)  Dr. Valdez reported Plaintiff's only functional limitations to be an inability to frequently lift and carry more than fifteen pounds. (Tr. at 121) He cited no other limitations to Plaintiff's ability to stand, walk, sit, push, pull, or otherwise carry out work-related physical activities. (Id.)

       *3.*      *Dr. Jerome Caiati, Industrial Medicine Associates, P.C.*

On October 2, 2008, Plaintiff underwent an internal medicine exam by consultative examiner, Dr. Jerome Caiati, M.D. (Tr. at 144-47.)  Plaintiff reported to Dr. Caiati that she was diagnosed with and hospitalized for depression in 1998, had had peptic ulcer disease and H. pyloric gastritis since 1985, and developed low back pain in 2008. (Tr. at 144.)  Dr. Caiati's report indicated that Plaintiff was taking eight different medications at the time of the examination.[2] (Id.)

---

[2] Those medications were: Acidophilus pills, Pink bismouth, Lexapro, Nexium, Zolpidem, Amoxicillin, Clarithromycin, and Helidac therapy.  (Tr. at 144.)

Plaintiff reported that she was able to cook, clean, do laundry, go shopping, care for her children, shower and dress herself, watch television, and go out shopping. (Id.)  Dr. Caiati observed that Plaintiff was in no acute distress, and that her gait and stance were normal. (Tr. at 145.)  Plaintiff was able to squat fully, and required no assistance changing for the examination, or getting on or off the examination table. (Id.)

A physical and neurological examination yielded normal results. (Tr. at 145-46.) Plaintiff's abdomen was soft and non-tender, and her bowel sounded normal. (Tr. at 146.)  Dr. Caiati found no evidence of scoliosis, kyphosis, or other abnormality in Plaintiff's thoracic spine. (Id.)  An X-ray of Plaintiff's lumbosacral spine taken on October 2, 2008, was also negative. (Tr. at 146, 148.)  Dr. Caiati observed that Plaintiff had full range of motion in her spine and other extremities, and that she had full grip strength and fine motor activity in her hands and fingers bilaterally. (Tr. at 146.)  Dr. Caiati concluded that Plaintiff had no restrictions for sitting, standing, walking, reaching, pushing, pulling, climbing, bending, and lifting. (Tr. at 147.)

4.    *Dr. Haruyo Fujiwaki, Industrial Medicine Associates, P.C.*

Also on October 2, 2008, Plaintiff underwent a consultative psychiatric evaluation by Dr. Haruyo Fujiwaki, Ph.D. (Tr. at 149-52.)  The evaluation was conducted using an Industrial Medicine Associates interpreter. (Tr. at 149.)  Plaintiff arrived to the appointment by train, travelling approximately two hours. (Id.)

Plaintiff indicated to Dr. Fujiwaki that she was hospitalized in 1998 for depression, and had been seeing a psychiatrist once per month and psychologist once per week at the Upper Manhattan Mental Health Center. (Id.)  Plaintiff reported ongoing stomach problems and back

pain. (Id.)  Dr. Fujiwaki's report noted that Plaintiff was taking five different medications at the time of the evaluation.[3] (Id.)

Plaintiff reported that she had difficulty falling asleep and loss of appetite. (Id.)  Plaintiff stated that she had suffered from depression since 1998, and had the following symptoms: dysphoric moods, crying spells, loss of usual interests, loss of energy, concentration difficulties, and social withdrawal. (Id.)  Plaintiff reported that two months prior to the October 2, 2008 evaluation, she "felt something," and fell to the floor trembling, dizzy, and unconscious. (Tr. at 149-50.)  Plaintiff denied suffering frequent anxiety attacks or manic symptoms. (Tr. at 150.)  Plaintiff reported experiencing auditory and visual hallucinations. (Id.)  Plaintiff denied current suicidal ideation, intent, or plan, and reported no drug or alcohol history. (Id.)

Dr. Fujiwaki observed Plaintiff to be responsive and cooperative. (Id.)  He indicated her manner of relating, social skills, and overall presentation to be fair. (Id.)  Plaintiff was adequately groomed, and her gait and posture were normal. (Id.)  Dr. Fujiwaki reported Plaintiff's motor behavior was lethargic, but eye contact was appropriately focused and speech was adequate. (Id.)  Plaintiff's thought processes were coherent and goal directed, with no evidence of hallucinations, delusions, or paranoia. (Id.)  Dr. Fujiwaki observed Plaintiff's affect to be depressed and her mood dysthymic. (Id.)  Plaintiff was oriented in three spheres, and her sensorium was clear. (Id.)

Plaintiff's attention, concentration, and recent and remote memory skills were mildly impaired, possibly due to emotional distress resultant to depressed mood and limited intellectual function. (Tr. at 151.)  Plaintiff had difficulty with serial threes. (Id.)  Dr. Fujiwaki assessed Plaintiff's intellectual functioning to be below average, and her general fund of information was somewhat limited. (Id.)  Plaintiff's insight was fair, but her judgment was poor. (Id.)

---

[3] Those medications were: Lexapro, Nexium, Zolpidem, Amoxicillin, and Clarithromycin. (Tr. at 149.)

Plaintiff reported that she was able to dress, bathe, and groom herself, and do the cooking and cleaning once per week. (Id.)  Plaintiff indicated that, if not depressed, she was also able to do laundry and grocery shopping. (Id.)  Plaintiff reported difficulty managing money, and that she was unable to take public transportation alone. (Id.)  Plaintiff stated that she socialized occasionally, and had a good relationship with three of her four children. (Id.)  Plaintiff denied having any hobbies or interests, and stated she spent her days taking care of her children. (Id.)

Dr. Fujiwaki assessed that Plaintiff was able to follow and understand simple directions and instructions. (Id.)  He reported that Plaintiff could perform simple tasks, but required supervision. (Id.)  He observed Plaintiff to have difficulty maintaining attention and concentration, and that she could not maintain a regular schedule due to depressed mood. (Id.)  He indicated that Plaintiff may have great difficulty learning new tasks, performing complex tasks, and making appropriate decisions, due to depressed mood and limited intellectual function. (Id.)  He assessed that Plaintiff could relate with others and deal with stress "to a certain extent." (Id.)  Dr Fujiwaki stated that the results of the evaluation were consistent with psychiatric and cognitive problems which "may significantly interfere with Plaintiff's ability to function on a daily basis." (Id.)

Dr. Fujiwaki diagnosed Plaintiff with Axis I major depressive disorder with psychotic feature, partially controlled by psychiatric medication, and anxiety disorder, not otherwise specified. (Tr. at 152.)  Axis II diagnosis was deferred. (Id.)  Axis III diagnoses were backache and stomach problems. (Id.)  Dr. Fujiwaki recommended that Plaintiff continue with psychological and psychiatric treatment, and listed her prognosis as guarded. (Id.)

5.      *Dr. T. Harding, State Agency Review Psychologist*

On October 20, 2008, state agency review psychologist Dr. T. Harding reviewed the evidence of record, and assessed Plaintiff's psychiatric condition. (Tr. at 153-72.) Dr. Harding noted medically determinable impairments of major depression and anxiety disorder, not otherwise specified. (Tr. at 156, 158.) Dr. Harding assessed Plaintiff's functional limitations as: mild restriction in activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. at 163.) He stated that there was insufficient evidence regarding repeated episodes of deterioration of extended duration, and that none of the assessed restrictions satisfied the degree of limitation, either marked or extreme, required by the functional criteria. (Id.)

Dr. Harding also assessed Plaintiff's mental residual functional capacity ("RFC")[4] using a twenty-category evaluation. (Tr. at 167-69.) Dr. Harding indicated that Plaintiff had no significant limitation in her ability to: (1) remember locations and work-like procedures, (2) understand, remember, and carry out very short and simple instructions, (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, (4) sustain an ordinary routine without special supervision, (5) work in coordination with or proximity to others without being distracted by them, (6) make simple work-related decisions, (7) interact appropriately with the general public, (8) ask simple questions or request assistance, (9) get along with coworkers or peers without distracting them or exhibiting behavioral extremes, (10) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and (11) be aware of normal hazards and take appropriate precautions. (Tr. at 167-68.)

---

[4] "An individual's [RFC] is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments." (Tr. at 11.)

Dr. Harding assessed that Plaintiff had moderate limitations in her ability to: (1) understand, remember, and carry out detailed instructions, (2) maintain attention and concentration for extended periods, (3) complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods, (4) accept instructions, and respond appropriately to criticism from supervisors, (5) respond appropriately to changes in the work setting, (6) travel in unfamiliar places or use public transportation, and (7) set realistic goals, or make plans independently of others. (Id.) Dr. Harding noted no marked limitations for any categories. (Id.)

In a separate electronic request for medical advice dated October 20, 2008, Dr. Harding advised that available evidence indicated that Plaintiff had mild to moderate psychologically-related limitations, and had a capacity for unskilled work tasks. (Tr. at 171.) He noted that Plaintiff was able to understand and follow simple directions, make simple work related decisions, interact in cooperative fashion, and tolerate the types of changes typically present in unskilled work settings. (Id.)

6.    *Unsigned and Undated Medical Report (Exhibit 9F)*

At the hearing on December 15, 2009, Plaintiff allegedly submitted an eight-page report for claim of disability due to mental impairment, the first seven pages of which are contained in the record.[5] (Tr. at 181-87.) The time period covered by the report was listed as August 24, 1998 to November 3, 2009 (the dates of the author's first and last meetings with the Plaintiff). (Tr. at 181.) The report noted that Plaintiff "attends medication [sic] on a monthly basis and psychotherapy sessions every two weeks." (Id.) The report listed Plaintiff's diagnoses as: Axis I

---

[5] In a footnote in her brief, Plaintiff states that Exhibit 9F, a seven-page report which appears in the record, should have contained an additional eighth page. (Pl.'s Br. at 2 n.3.) The alleged missing page is dated November 3, 2009, and contains the signature of psychiatrist, Dr. Yvonne Kury. (See Pl.'s Notice of Motion., Ex. B.)

major depressive disorder; Axis II dependant personality disorder; Axis III gastristis; and Axis IV no change in condition, family conflicts. (Id.)  Plaintiff's current, lowest, and highest global assessment of functioning ("GAF") scores were each assessed as 60, indicating moderate symptoms or difficulty in social, occupational, or school functioning. (Id.)

Plaintiff reported feeling depressed, tired, unmotivated, angry, and extremely anxious. (Tr. at 182.)   Plaintiff also reported severe and frequent stomach pain due to gastritis. (Id.)  The report noted that Plaintiff appeared casually dressed, calm, and cooperative. (Id.)  Plaintiff's mood was observed to be depressed and anxious, and her affect constricted. (Id.)  Plaintiff's speech was coherent, and intellectual functioning, insight, and judgment were assessed as fair. (Id.)  The report noted no delusions or hallucinations. (Id.)

The report indicated that no tests were administered. (Tr. at 183.)  Plaintiff's therapy at the time consisted of psychotherapy, and Plaintiff's listed medications were Paxil and Ambien, neither of which limited the Plaintiff's activities or resulted in side effects. (Id.)  The report stated that Plaintiff would not have difficulty traveling alone to work on a daily basis by bus or subway. (Id.)

The report indicated that Plaintiff had moderate functional limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace. (Tr. at 184-85.)  The report also noted that Plaintiff had experienced one or two episodes of deterioration or decomposition at work or in work-like settings. (Tr. at 185.)

A mental RFC assessment of Plaintiff indicated that she was moderately to markedly limited in eighteen specified areas of mental functioning. (Tr. at 186-87.)  Specifically, the report noted that Plaintiff had moderate limitations in her ability to: (1) remember locations and work-like procedures, (2) understand, remember, and carry out very short and simple instructions, (3)

12

make simple work-related decisions, (4) ask simple questions or request assistance, (5) maintain

socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and (6)

be aware of normal hazards and take appropriate precautions. (Id.)

　　　The report indicated Plaintiff had marked limitations in her ability to: (1) understand,

remember, and carry out detailed instructions, (2) maintain attention and concentration for

extended periods, (3) perform activities within a schedule, maintain regular attendance, and be

punctual within customary tolerances, (4) sustain an ordinary routine without special

supervision, (5) work in coordination with or in proximity to others without being distracted by

them, (6) complete a normal workday and workweek without interruptions from psychologically

based symptoms, and perform at a consistent pace without an unreasonable number and length of

rest periods, (7) interact appropriately with the general public, (8) accept instructions and

respond appropriately to criticism from supervisors, (9) get along with coworkers or peers

without distracting them or exhibiting behavioral extremes, and (10) respond appropriately to

changes in the work setting. (Id.)

　　　The allegedly missing eighth page of the report noted that Plaintiff was also markedly

limited in the areas of: (11) traveling in unfamiliar areas or using public transportation, and (12)

setting realistic goals or making plans independently of others. (Pl.'s Notice of Motion, Ex. B.)

　　　7.　　*Evidence Submitted After the Adjudicated Period*

　　　Following the issuance of the ALJ's decision denying Plaintiff SSI benefits on January

21, 2010, Plaintiff submitted additional medical evidence to the Appeals Council on March 2,

2011, consisting of a second "biopsychosocial" evaluation at F.E.G.S conducted in January and

February of 2011. (Tr. at 188-236.)

In the F.E.G.S. report, Plaintiff indicated that was able to travel independently by bus and train. (Tr. at 204-205.)  Plaintiff reported that she was last employed as a cleaner at a grocery store from 2006-2007, but was currently unable to work due to medical and mental health conditions. (Tr. at 206.)  The report noted Plaintiff was "not interested in working." (Tr. at 200.) Plaintiff reported spending her days at home, attending necessary appointments, and caring for her home. (Tr. at 205.)  Plaintiff stated that she was able to wash dishes, watch television, make beds, read, get dressed, bathe, use the toilet, and groom herself. (Id.)  The report noted that Plaintiff reported limitations in completing activities such as sweeping, mopping, and grocery shopping, due to back pain and fatigue. (Id.)  Plaintiff stated that her daughter assisted her with those activities. (Id.)

Plaintiff denied any past or current misuse of alcohol or other substance. (Tr. at 206.) Plaintiff reported receiving treatment for depression at ACDP Outpatient Mental Health since January 20, 2011, and for more than twenty-four months prior to that at the Upper Mental Health Center. (Id.)  Plaintiff stated that she saw psychiatrist Howard Raiten weekly, and listed her medications at the time to include: Paroxetine, Ripseridone, and Zolpidem. (Id.)  Plaintiff reported having suicidal or self-injurious thoughts, and having attempted to commit suicide by overdosing on pills on three occasions in 1998, which resulted in her hospitalization. (Id.) Plaintiff denied any past or current visual or auditory hallucinations. (Id.)

Plaintiff reported feeling depressed nearly every day, and having little interest in doing things the majority of days. (Tr. at 203-04.)  Plaintiff also stated that she had difficulty falling asleep, and felt tired and lethargic the majority of days. (Tr. at 204.)  Plaintiff reported experiencing poor appetite or overeating, and low self-esteem several days per week. (Id.) Plaintiff stated that the problems she was experiencing made it very difficult for her to do work,

take care of things at home, or get along with other people. (Id.)  Plaintiff's self-reported answers yielded a PHQ-9 score of 14, indicating a rating of moderate depression. (Id.)

Dr. Anthony Greenidge performed a medical examination. (Tr. at 209-12, 215-18.) Plaintiff's physical examination was "normal," except for a history of lower back pain. (Tr. at 210-11.)  Plaintiff reported her lower back pain at the time of the examination to be seven out of ten, with the worst pain she had experienced being ten out of ten, and the least being four out of ten. (Id.)  A mental status examination revealed dysphoric mood and affect. (Id.)

Dr. Greenidge assessed Plaintiff's work limitations, and indicated that she could perform one to three hours of bending, and could lift and carry up to twenty pounds at a time, up to ten times per hour. (Id.)  He also indicated that Plaintiff should be restricted to low-stress environments, and is unable to travel during rush hours. (Tr. at 212-14.)  Dr. Greenidge diagnosed Plaintiff with peptic ulcer disease, lumbago, generalized anxiety disorder, and depressive disorder. (Tr. at 213.)

On February 11, 2011, Plaintiff underwent a referral psychiatric examination by psychiatrist Dr. Jorge Kirchstein. (Tr. at 222-26.)  Dr. Kirchstein observed that Plaintiff was neat and cooperative, and that her speech was normal. (Tr. at 225.)  Plaintiff appeared restless, and her mood depressed. (Tr. at 224-25.)  Plaintiff's form of thought was logical, her thought content and reality testing normal, and no suicidal or homicidal thoughts were reported. (Id.)  Plaintiff was alert, and her attention and memory were intact. (Tr. at 224.)  Dr. Kirchstein found that Plaintiff was moderately impaired in her ability to follow work rules, relate to co-workers, accept supervision, adapt to change, deal with the public, and maintain attention. (Id.)  He also found a severe limitation in her ability to adapt to stressful situations, and in persistence. (Id.)

Dr. Kirchstein diagnosed Plaintiff with Axis I major depressive disorder and generalized anxiety disorder; Axis II dependent personality disorder; and Axis IV economic problems. (Tr. at 223.)  Plaintiff's current and previous year's GAF scores were both 40, indicating some impairment in reality testing or communication, or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. (Id.)

The report observed that Plaintiff had partially improved after years of treatment, but was still severely vocationally impaired due to major depression, generalized anxiety disorder, and poor vocational prognosis. (Tr. at 222.)  Plaintiff was found to have "substantial functional limitations to employment due to medical conditions that will last for at least twelve months and make the individual unable to work." (Id.)

## D.     The Disability Determination

To be eligible for disability benefits under the Act, a claimant must establish his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Further, the claimant's physical or mental impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Social Security Administration has promulgated a five-step sequential procedure for evaluating disability claims:

1. The [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.

2. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.

3. If the claimant suffers such an impairment . . . . the [Commissioner must ask] whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.

4. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . .  Assuming the claimant does not have a listed impairment, the [Commissioner] then asks whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.

5. If the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464 (2d Cir. 1982); see 20 C.F.R. §§ 404.1520(a), 416.920(a).  The facts that must be considered in determining a claimant's benefit entitlement are: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983).

In concluding that Plaintiff here was not under a disability within the meaning of the Act, the ALJ adhered to this five-step sequential analysis. (See Tr. at 7-18.)  At the first step, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the application date of July 15, 2008. (Tr. at 12.)  At the second step, the ALJ determined that Plaintiff had two severe impairments that caused more than minimal limitations in basic work-related functions: an anxiety related disorder and a depressive disorder. (Id.)  The ALJ found that Plaintiff's alleged impairments of peptic ulcer disease, gastritis, and back pain were nonsevere. (Id.)  While Plaintiff had a history of these conditions, the ALJ determined that without medical findings to

17

support Plaintiff's claim of continued limitations and pain, no severe physical impairment existed that could be considered functionally restrictive. (Id.)

At the third step, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that "meets or medically equals one of the listed impairments in [the Act]." (Tr. at 12-13.)  In order to qualify as an impairment, the condition must result in at least two of the following: "marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decomposition, each of extended duration."  (Tr. at 13 (citing 20 C.F.R. § 404, Subpt. P, App. 1 §§ 12.04, 12.06)).  The ALJ determined that because Plaintiff had only mild to moderate restrictions in each of these areas, and no experience of any decomposition episodes, Plaintiff's mental impairment did not satisfy the requirement of causing at least two "marked" limitations. (Tr. at 13.)

At the fourth step, the ALJ assessed Plaintiff's RFC.  (Tr. at 13-15.)  After considering the entire record, the ALJ found that Plaintiff had the RFC to perform at all exertional levels that required only simple, unskilled work. (Tr. at 13-14.)  The ALJ used a two-step process to consider Plaintiff's symptoms. (Id.)  First, he determined whether there was an underlying medically determinable physical or mental impairment that could be shown by medically acceptable clinical and laboratory diagnostic techniques, and could reasonably be expected to produce the claimant's pain or other symptoms. (Id.)  If such impairment could be shown, the ALJ then evaluated the "intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities." (Tr. at 14.)  The ALJ found that although Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms alleged, the Plaintiff's "statements concerning the

18

intensity, persistence, and limiting effects" of the symptoms were "not credible to the extent they are inconsistent with the . . . residual functional capacity assessment." (Id.)

The ALJ determined that despite suffering from depression and anxiety since 1998, Plaintiff had nonetheless been able to work as a cashier for a two-year period, was capable of performing numerous activities of daily living independently, and retained the ability to understand and follow simple directions and perform simple tasks independently. (Id.)  The ALJ gave "little weight" to the opinion offered in Exhibit 9F, finding it broad, overly restrictive, and inconsistent with the record and treating notes. (Tr. at 14-15.)  The ALJ relied more heavily on the findings of the state agency physicians in coming to his decision. (Id.)  The ALJ thus determined that Plaintiff had no physical limitations, but her psychological condition limited her to performing simple, unskilled work. (Tr. at 14.)

At the fifth step, the ALJ determined that Plaintiff was capable of performing past relevant work as a cashier since it was simple and unskilled, and hence, did not require the performance of work-related activities precluded by Plaintiff's RFC. (Tr. at 15.)   Since Plaintiff did not meet her burden of proving a disability under the Act, the ALJ concluded that Plaintiff was "not disabled." (Tr. at 16.)

## II.     LEGAL STANDARD

Plaintiff moves for an order reversing the ALJ's determination pursuant to 42 U.S.C. § 405(g), which provides in pertinent part:

> Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.

42 U.S.C. § 405(g); see also Richardson v. Perales, 402 U.S. 389, 401 (1971); Perez v. Chater, 77 F.3d 41, 44-46 (2d Cir. 1996).

The Commissioner's decision should be given substantial deference, Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991), and the reviewing court "may not substitute its own judgment for that of the [Commissioner's], even if it might justifiably have reached a different result upon a de novo review." Id. (quoting Valente v. Sec'y of H.H.S., 733 F.2d 1037, 1041 (2d Cir. 1984)). Courts are to uphold the Commissioner's decision even if there is also substantial evidence for the plaintiff's position, unless it is based on an error of law or it is not supported by substantial evidence. Melville v. Apfel, 198 F.3d 45, 51-52 (2d Cir. 1999); Alston v. Sullivan, 904 F.2d 122, 126-27 (2d Cir. 1990).  The Commissioner's findings of fact, if supported by substantial evidence,[6] are conclusive. 42 U.S.C. § 405(g); Rutherford v. Schweiker, 685 F.2d 60, 61 (2d Cir. 1982).

## III.    DISCUSSION

## A.    The ALJ Properly Assessed Plaintiff's Residual Functional Capacity

Plaintiff argues that the ALJ failed to accurately assess Plaintiff's RFC by not properly considering Dr. Harding's or Dr. Fujiwaki's assessments that Plaintiff is psychologically limited in several areas of functioning. (Pl.'s Br. at 10, 12, 15-16.)  The ALJ concluded that Plaintiff should be limited to simple, unskilled work, noting that "the state agency physicians found that the claimant suffered no physical limitations and retained the ability to perform simple, unskilled work." (Tr. at 15.)  The ALJ further concluded that the state agency physicians "are highly qualified and are experts in Social Security disability evaluation," and again noted this restriction when considering whether Plaintiff could do her past work as a cashier. (Id.)

---

[6] The Supreme Court defines substantial evidence as "more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401 (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

In considering opinion evidence, the ALJ considered the opinion of the state agency psychologist, Dr. Harding.  In October 2008, Dr. Harding noted only mild and moderate limitations in Plaintiff's functioning, assessing that Plaintiff could understand and follow simple directions, make simple work-related decisions, interact in cooperative fashion, and tolerate the types of changes typically present in unskilled work settings. (Tr. at 167-68, 171.)  This assessment is consistent both with the findings of Dr. Fujiwaki, who noted that Plaintiff was able to understand and follow simple directions, and with Plaintiff's own testimony at the December 15, 2009 hearing, in which she stated that she cared for her children, performed household chores, used the computer, visited her cousin, visited her children's schools, and traveled to the Dominican Republic. (Tr. at 22, 29-31, 33, 151.)  Dr. Fujiwaki's assessment that Plaintiff required supervision for simple tasks diverged from the findings made by Dr. Harding, Dr. Valdez, and Dr. Caiati. (Tr. at 121, 147, 171.)

As it is not the role of the Court to review the evidence de novo, Plaintiff's argument that the ALJ improperly relied on Dr. Harding's assessment over Dr. Fujiwaki's assessment in making the RFC determination is unavailing.  The Court is satisfied that the ALJ's determination that Plaintiff had the RFC for a full range of simple, unskilled work, was based on substantial evidence in the record, and supported by Plaintiff's own testimony.

**B.      The ALJ Properly Made Specific Findings of Fact Regarding the Demands of Plaintiff's Past Work and Residual Functional Capacity**

In a policy statement published under the authority of the Commissioner of Social Security, the Social Security Administration ruled that

> In finding that an individual has the capacity to perform a past relevant job, the determination or decision must contain among the findings the following specific findings of fact: (1) a finding of fact as to the individual's RFC; (2) a finding of fact as to the physical and mental demands of the past job/occupation; and (3) a

> finding of fact that the individual's RFC would permit a return to his or her past
> job or occupation.

SSR 82-62, 1982 WL 31386, at *4 (1982).  Plaintiff argues that the ALJ's decision should be

vacated based upon the ALJ's failure to make specific findings regarding the physical and mental

demands of Plaintiff's past work as a cashier. (Pl.'s Br. at 10-12.)

The Commissioner argues that the physical requirements of Plaintiff's past work were not

relevant because the ALJ determined that she had the physical RFC for work at all levels of

exertion. (Id.)  At the December 15, 2009 hearing, the ALJ properly inquired into the demands of

Plaintiff's past work. (Tr. at 26.)  Plaintiff testified that she worked at a grocery store five days a

week, for seven hours a day, and her duties included cleaning, assisting customers, and

occasionally working as a cashier. (Tr. at 25-26.)  Based upon Plaintiff's own testimony and the

evidence in the record, the ALJ determined that Plaintiff's past work as a cashier was simple and

unskilled. (Tr. at 15.)  The ALJ considered Dr. Caiati's assessment that Plaintiff had no physical

limitations and was capable of work at all levels of exertion, and determined that Plaintiff had

the physical RFC for a full range of simple, unskilled work. (Tr. at 12-15.)

The Commissioner further argues that the ALJ properly considered the mental demands

of Plaintiff's past work as she actually performed it. (Def.'s Br. at 19.)  Under 20 C.F.R. §

416.921(b), unskilled work requires:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling,
> reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions; (4) Use of
> judgment; (5) Responding appropriately to supervision, co-workers and usual
> work situations; and (6) Dealing with changes in a routine work setting.

These demands are consistent with Dr. Harding's assessment of Plaintiff's abilities. (Tr. at 171.)

Based upon Plaintiff's statements that she was diagnosed with depression in 1998, and worked

from 2006-2008, the ALJ determined that the mental demands of the job had not precluded

22

Plaintiff from performing her work for two years despite her mental impairment. (Tr. at 15, 25, 198.)  The ALJ's determination is based on substantial evidence in the record, and supported by Plaintiff's own testimony.

**C.     The ALJ Properly Developed the Record**

Plaintiff argues that the ALJ failed to properly develop the record regarding Plaintiff's mental impairment. (Pl.'s Br. at 13.)  The ALJ has an affirmative duty to develop the record, whether the claimant is pro se or otherwise represented. Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996).  When the record contains sufficient medical evidence concerning Plaintiff's impairment, however then the ALJ is not required to seek additional evidence. See 20 C.F.R. § 404.1512.

Plaintiff argues that the ALJ did not make any efforts before or after the hearing to seek records of Plaintiff's treatment for depression and anxiety. (Pl.'s Br. at 13.)  However, as the Commissioner correctly points out in his brief, the Commissioner made seven attempts to obtain the records: mailing requests to Dr. Kury on August 21, 2008, September 4, 2009, September 18, 2009, and October 3, 2009, and to the Upper Manhattan Health Center on September 18, 2008, October 1, 2008, and October 10, 2008. (Def.'s Br. at 19-22; see Tr. at 174-75, 178-79.) Consistent with his obligations, the Commissioner made "every reasonable effort" to acquire Plaintiff's records. See 20 C.F.R. §416.912(d) (defining "every reasonable effort" as an initial request and one follow-up request).

Moreover, at the hearing on December 15, 2009, the ALJ offered to keep the record open for an additional two weeks following the hearing to allow Plaintiff an opportunity to obtain the treatment records. (Tr. at 35.)  In fact, the record remained open for five weeks after the hearing before the ALJ issued his decision. (Def.'s Br. at 21; see Tr. at 7-18, 19-35.)  Therefore, the ALJ fully satisfied his duty to develop the record by leaving the record open for an ample amount of

time for Plaintiff to submit treatment records.  Since the psychiatric treating records were not

available despite numerous attempts to obtain them, the ALJ properly ordered a psychiatric

consultative examination. (See Tr. at 149-52.)  The record thus contained sufficient evidence to

make a disability determination, and the ALJ was under no obligation to seek additional

treatment records.  Therefore, the ALJ properly satisfied his duty to develop the record.

**D.     Evidence Submitted After the Hearing Did Not Relate to the Relevant Period and Did Not Provide a Basis to Change the ALJ's Decision**

Under 42 U.S.C. § 405(g), a court may order the Commissioner to consider additional

evidence after the hearing, "but only upon a showing that there is new evidence which is material

and that there is good cause for the [claimant's] failure to incorporate such evidence into the

record in a prior proceeding."  However, new and material evidence will provide a basis for the

Appeals Council to change the ALJ's decision "only where it relates to the period on or before

the date of the [ALJ] hearing decision." 20 C.F.R. §§ 404.970(b), 416.1470(b).

The Commissioner argues that the materials Plaintiff submitted after the ALJ's January

21, 2010 decision do not provide a basis for changing the ALJ's decision because (1) the records

do not relate to the period at issue, and (2) the records are not contrary to the weight of the

evidence of the record. (Def.'s Br. at 22.)  Since the additional evidence, consisting of an

evaluation by F.E.G.S., was dated January and February 2011, and the ALJ issued his decision in

January 2010, it does not provide a basis to change the ALJ's decision. (Tr. at 190-236.)

**E.     The Absence of the Final Page of Exhibit 9F from the Record Does Not Provide a Basis for Remand**

Submitted along with Plaintiff's motion was a document alleged to be the missing final

page of the unsigned report in Exhibit 9F. (Pl.'s Notice of Motion, Ex. B.)  The submitted page

("submitted page") is signed by Dr. Yvonne Kury, and dated November 3, 2009. (Id.)  Plaintiff

argues that it was submitted as part of Exhibit 9F to the ALJ at the hearing on December 15, 2009, but was inadvertently omitted when office staff scanned the document into the electronic record. (Pl.'s Br. at 2).  However, in the absence of the last page containing Dr. Kury's signature, the ALJ considered Exhibit 9F to be the anonymous opinion of a medical professional, rather than the report of Plaintiff's treating physician. (Tr. at 15.)

The Commissioner argues that the submitted page was properly omitted from the certified record, Plaintiff having failed to note or bring the issue to the Court's attention despite having received copies of the exhibits contained in the record and a recording of the hearing. (Def.'s Br. at 23.)  As such, the Commissioner argues that the Court is prohibited from considering the submitted page in reviewing the ALJ's decision because it is evidence outside the administrative record. (Def.'s Br. at 23-24.)

Plaintiff's argument that the submitted page is the final page of the unsigned report contained in Exhibit 9F is consistent with the evidence on record.  The sequential numbering continues from the last page of Exhibit 9F onto the submitted page, and the initials "Y.K." that appear in Exhibit 9F correspond with the signature of Dr. Yvonne Kury on the submitted page. (Pl.'s Notice of Motion, Ex. B; Tr. at 184-85.)

The Commissioner's argument that the submitted page was properly omitted from the ALJ's consideration is based upon his characterization of the submitted page as new evidence. Yet, if the absence of the submitted page from the record is due to a clerical error, it is not new evidence, and should have been included in the record for the ALJ's consideration.  Whether this clerical error warrants remand of the case, however, depends on whether the absence of the submitted page "cast[s] into doubt the existence of substantial evidence to support the ALJ's decision."  Morris v. Bowen, 864 F.2d 333, 335 (5th Cir. 1988).  "Procedural perfection in

administrative proceedings is not required," and a "court will not vacate a judgment unless the substantial rights of a party have been affected." May v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988).

Plaintiff does not directly address the repercussions of the absence of the submitted page in her brief because Plaintiff functioned on the assumption that the submitted page was part of the record.  Plaintiff instead alleges error of law arising from the ALJ's substitution of his own opinion for that of Dr. Kury, the treating physician; failure to consider the requisite factors under 20 C.F.R. § 404.1527(d)(2)-(6), which assist in determining how to weigh a medical opinion; and failure to state valid reasons for refusing to give Dr. Kury's opinion controlling weight. (Pl.'s Br. at 13-17.)   Because the absence of the submitted page from the record precluded the ALJ from properly considering Exhibit 9F as the opinion of the treating physician, however, it can be imputed from Plaintiff's argument that the absence of the submitted page resulted in what Plaintiff alleges was the ALJ's improper appraisal of the opinions contained in Exhibit 9F, and discount of its weight.  The Commissioner argues that there is no evidence the ALJ would have rendered a different decision even had the submitted page been properly included in the record. (Def.'s Br. at 25-26.)

Under 20 C.F.R. §404.1527(d)(2), the opinion of a treating physician is given controlling weight if "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  The ALJ must consider the length and frequency of the treatment relationship, and frequency of examination; nature and extent of the treatment relationship; supporting evidence presented by the treating source for the opinion; consistency of the opinion with the record as a whole; and

whether the treating source is a specialist. Id.  It is not necessary that the ALJ recite each factor explicitly, only that the decision reflects application of the substance of the rule. Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004).

Despite not explicitly evaluating Exhibit 9F as the treating physician's report, the ALJ did properly apply the substance of the treating physician rule in determining how to weigh the opinion.  While the ALJ did not know the specific identify of the author of the report in Exhibit 9F, the report itself indicated that it was the medical opinion of a physician who had been treating the Plaintiff for over ten years. (Tr. at 181.)  The ALJ properly considered the report – absent the missing pages – including the observations and assessments made by the physician, but nonetheless determined that the opinion offered in Exhibit 9F was inconsistent with substantial evidence of record. (Tr. at 15.)  The ALJ specifically pointed out inconsistencies with the clinical findings observed by the physician in the report itself, the findings of the other medical experts, and Plaintiff's own reported daily activities, all of which indicated Plaintiff to be unrestricted in her ability to carry out simple, unskilled work. (Id.)  The ALJ did not discuss Dr. Kury's specialization, but nothing in the administrative record or missing page suggests one.

Thus, even if Exhibit 9F had been considered as the opinion of Plaintiff's treating physician, it still would not have been accorded controlling weight, due to its inconsistencies with the substantial evidence on record.  This was not a substitution of the ALJ's own opinion, but consideration and deferral to the substantial evidence and medical opinions in the record. Accordingly, the mistake was harmless, and Plaintiff is not entitled to remand, as the absence of the submitted page from the record affected neither Plaintiff's substantial rights nor the outcome of the ALJ's decision.  Plaintiff's arguments that the ALJ failed to either consider the requisite

factors under 20 C.F.R. § 404.1527(d)(2)-(6) or to offer valid reasons for not giving controlling weight to the opinion in Exhibit 9F, are without merit.

### IV.   CONCLUSION

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings (ECF No. 15) is granted, and Plaintiff's cross-motion (ECF No. 11) is denied.

IT IS SO ORDERED.

Dated: New York, New York
       August 20, 2012

_____
Robert P. Patterson, Jr.
U.S.D.J.

28

**Copies of this Opinion faxed to:**

*Counsel for Plaintiff:*

**Steven R. Banks**
The Legal Aid Society (Civil Div. NYC)
953 Southern Blvd.
4th floor
Bronx, NY 10459
(646)-340-1938
Fax: 212-509-8432

**Helen Marilyn Frieder**
Legal Aid Society (BX2)
Bronx Neighborhood Office
953 Southern Boulevard
Bronx, NY 1107
(718)-991-4758
Fax: (718) 842-2867

*Counsel for Defendant:*

**Susan D. Baird**
U.S. Attorney's Office, SDNY (St Andw's)
One St. Andrew's Plaza
New York, NY 10007
(212) 637-2200
Fax: (212) 637-2750